**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No. 03-cr-00560** |
| | ) | **(RBW)** |
| | ) | |
| **VINCENT E. REED,** | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**EMERGENCY**
**MOTION TO REDUCE SENTENCE PURSUANT TO**
**THE COMPASSIONATE RELEASE STATUTE**
**18 U.S.C. § 3582(c)(1)(A)(i)**

Mr. Vincent Reed, through undersigned counsel, respectfully requests that this Court

grant him compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) on the basis of both

his son's prognosis of end-stage kidney disease and his own diagnosis of COVID-19 at USP

Lompoc, an institution overrun with the sick and dying.

**INTRODUCTION**

Towards midnight on April 19, 2020, Mr. Reed wrote the following to counsel:

> **We been locked down everyday on quartine. i've been diagnosed with covid-19. i'm fight for my life everyday Idk what will happen. I can't get anyone to tell me whats going on. God Bless hope your well.**

*See* Ex. A (Email to Counsel).  On April 20, 2020, USP Lompoc was placed on a 14-day facility-

wide lockdown, during which "staff [are] encouraged to use inmate discipline as a management

tool."  Ex. B (USP Lompoc Memoranda).  Counsel has not been able to contact Mr. Reed since.

Mr. Reed had already filed for compassionate release with the warden of his facility on

January 7, 2020, because his son, Vincent Reed Jr., has juvenile diabetes, is fully blind, and is

experiencing kidney failure at the age of 30; Mr. Reed may be the only viable candidate to

1

donate a kidney to his son; and Vincent Jr.'s elderly grandmother, who is currently his only caregiver, cannot continue his care alone.  *See* Ex. C (Request to Warden).  To date, the BOP has not responded.

Then, because of the BOP's inadequate response to the growing COVID-19 pandemic, Mr. Reed, who is 53 years old and African-American, contracted COVID-19 at USP Lompoc. He is one of **97 positive cases** and **1 death** listed on the BOP's website as of April 24, 2020—it has also been reported that the prison sent another inmate, who was too weak to stand but whom the prison did not check for the virus, home, only for him to die of COVID-19 a few days later.[1]

Mr. Reed does not want to die at USP Lompoc before he can see his son.  The hospitalization and death rate for COVID-19 increases with age,[2] and the virus disproportionately affects males and African-Americans.[3]  This Court may be concerned about

---

[1]     *See* Cal Coast Times, *Lompoc prison inmate dies amid worsening coronavirus outbreak (*Apr. 17, 2020), https://calcoasttimes.com/2020/04/17/lompoc-prison-inmate-dies-amid-worsening-coronavirus-outbreak/ ("Lompoc prison inmate dies"); Richard Winton, *Coronavirus outbreak at Lompoc prison is the worst in the nation: 69 inmates, 25 staff infected*, LA Times (Apr.16, 2020), https://www.latimes.com/california/story/2020-04-16/coronavirus-outbreak-at-lompoc-federal-prison-is-worst-in-nation-with-69-inmates-25-staff-infected ("Coronavirus outbreak at Lompoc prison").

[2]     *See* National Center for Health Statistics, *Provisional Death Counts for Coronavirus Disease (COVID-19)*, CDC (accessed on Apr. 23, 2020); https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm ("Provisional Death Counts"); World Health Organization (WHO), *Coronavirus disease 2019 (COVID-19) Situation Report – 51* at 2, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200311-sitrep-51-covid-19.pdf?sfvrsn=1ba62e57_8.

[3]     *See* Chris Mooney et al., *All across the United States, the coronavirus is killing more men than women, data show* Washington Post (Apr. 4, 2020), https://www.washingtonpost.com/health/2020/04/04/coronavirus-men/ ("The coronavirus is killing more men"); Reis Thebault et al., *The coronavirus is infecting and killing black Americans at an alarmingly high rate*, The Washington Post (Apr. 8, 2020), https://www.washingtonpost.com/nation/2020/04/07/coronavirus-is-infecting-killing-black-americans-an-alarmingly-high-rate-post-analysis-shows ("The coronavirus is infecting and killing black Americans at an alarmingly high rate").

ordering the release of someone with COVID-19, but Mr. Reed, USP Lompoc, and the community at large are already in great danger if he remains imprisoned.

Counsel cannot contact Mr. Reed, but reports throughout the country suggest what he may be experiencing.  He may be in quarantine with other positive inmates.  This may either be in a single room with several dozen other inmates or in a unit with just as many;[4] at USP Lompoc, some rooms that are now being used were previously closed because of mold contamination.[5]  In the alternative, Mr. Reed is in solitary confinement, an especially harrowing experience for those who have previously experienced depression, like Mr. Reed,[6] and who are now experiencing fever, chills, intense pain, and anxiety about the possibility of death.[7]  In either instance, often it is BOP employees, *not* doctors or nurses, who monitor sick inmates in the prison, and at USP Lompoc, the staff numbers are down because 29 are now sick.[8]  Given how rapid a COVID-19 patient may go from mild symptoms to requiring a ventilator, this situation

---

[4]     Keri Blakinger, *What Happens When More Than 300,000 Prisoners Are Locked Down?* The Marshall Project (Apr. 15, 2020), https://www.themarshallproject.org/2020/04/15/what-happens-when-more-than-300-000-prisoners-are-locked-down ("What Happens When More Than 300,000 Prisoners Are Locked Down?").

[5]     Tyler Hayden, *Inmates and Families Panic as Lompoc Prison Goes into Lockdown*, The Santa Barbara Independent (Apr. 22, 2020), https://www.independent.com/2020/04/22/inmates-and-families-panic-as-lompoc-prison-goes-into-lockdown/ ("Inmates and Families Panic").

[6]     *See* Presentence Investigation Report (PSR) at ¶62.

[7]     *What Happens When More Than 300,000 Prisoners Are Locked Down?*, https://www.themarshallproject.org/2020/04/15/what-happens-when-more-than-300-000-prisoners-are-locked-down.

[8]     Janet Reitman, *'Something Is Going to Explode': When Coronavirus Strikes a Prison*, N.Y. Times (Apr. 18, 2020), https://www.nytimes.com/2020/04/18/magazine/oakdale-federal-prison-coronavirus.html.

may easily prove deadly to Mr. Reed and other inmates alike.

Or perhaps Mr. Reed has been transferred as seriously ill to one of the two local community hospitals in the Lompoc area, where 2 prison officers would guard Mr. Reed in rotating shifts, further diminishing the staff numbers at the prison and putting those staff members, their families, and inmates at risk.[9]  These hospitals are currently overrun with the sick and dying from USP Lompoc, the only aggregate living facility with an outbreak in that community, and the hospitals are at risk of being unable to treat other members of the community in need.[10]

Even if, by the time this Court grants him compassionate release, Mr. Reed has recovered enough to be transferred back to the general population, he should not be: he is experiencing the pain, fear, and anxiety of being sick in an institution so unable to prevent the spread of the virus that "inmate discipline" counts as mitigation of the virus's spread.  What is more, there is not adequate information that once someone has contracted COVID-19, they are immune from contracting it again.[11]  Letting him be placed back into the general population may be letting him contract COVID-19 again, with the process only repeating itself.

---

[9]      *Coronavirus outbreak at Lompoc prison*, https://www.latimes.com/california/story/2020-04-16/coronavirus-outbreak-at-lompoc-federal-prison-is-worst-in-nation-with-69-inmates-25-staff-infected (as of April 16, 2020, "Of the 13 hospitalized inmates, five are at Santa Barbara's Cottage Hospital and eight are at Lompoc Valley Medical Center. Six are on ventilators.").

[10]     Press Release, *Carbajal, Harris, Feinstein request assistance for Lompoc U.S. Penitentiary to protect public health amid coronavirus outbreak* (Apr. 15, 2020), https://carbajal.house.gov/news/documentsingle.aspx?DocumentID=649 ("Assistance for Lompoc").

[11]     J. David Goodman and Michael Rothfeld, 1 in 5 New Yorkers May Have Had Covid-19, Antibody Tests Suggest, N. Y. Times (Apr. 23, 2020), https://www.nytimes.com/2020/04/23/nyregion/coronavirus-antibodies-test-ny.html.

In contrast to the risks if Mr. Reed remains incarcerated, he is able to minimize the risks to himself, his family, and the community upon his release.  First, because Mr. Reed's primary motivation for release is his son, he would not do anything to endanger him, and thus, despite his plans before the COVID-19 pandemic arose, he will not live with Vincent Jr. and his elderly grandmother in California.  Rather, upon his release, he will return to Washington, D.C., to live with his brother, Kevin Reed, who has no health conditions, at his home in Southeast.  Kevin lives there alone and Mr. Reed will isolate himself in an extra room, with Kevin delivering food and other necessities outside the door while masked and wearing gloves.  Unlike at USP Lompoc, there will be one loving family member, monitoring one sick adult, able to rush him to one of many well-equipped hospitals in the region.

Second, the CDC directs prisons that "[i]f an incarcerated[] individual who is a COVID-19 case is released from custody during their medical isolation period, [the prison should] contact public health to arrange for safe transport and continuation of necessary medical care and medical isolation as part of release planning."[12]  Mr. Reed therefore asks this Court to grant him compassionate release from USP Lompoc; and order the BOP to contact public health officials to arrange for his safe transport and care, thereby minimizing the risk to the community.

Finally, even more than in most of these cases, time is of the essence, and counsel asks the Court to order the government to respond to this motion no later than five days after its filing.

---

[12]      *See* CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, at 14, https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf ("Interim Guidance").

# BACKGROUND

## I.      Conviction, Sentencing and Appeal

As a young man, Mr. Reed was a successful basketball star recruited to many colleges with two secrets he kept close:  his parents were neglectful and abusive alcoholics and he was illiterate.  *See* PSR ¶¶55-56.  In fact, his home life was so chaotic that he moved out of his family home and into the home of a middle school principal he knew.  *Id*. ¶56.  His basketball skills allowed him to pass through high school notwithstanding his illiteracy, but doing so at college proved more problematic.  *Id*. ¶57.  While he completed two years of San Diego Community College on a scholarship, he was unable to pass placement exams to transfer to the University of Minnesota, at which point, embarrassed, he dropped out of school.  *Id*.  From there, his life spiraled downward into drug abuse, and then into crime.  *Id*. ¶¶39-41, 57.  His first two convictions were in the years following the failure of his educational and athletic careers: in 1990 at ages 23 and 24, he was convicted of two attempted drug crimes that occurred within six months of each other.  *Id*. ¶¶39-40.  His next conviction occurred ten years later, in 2000, for the attempted unauthorized use of a vehicle.  *Id*. ¶41.

Then, three years later, he committed the instant offense.  Mr. Reed and his brother Ronald Reed robbed a small credit union on the campus of Catholic University in Washington D.C. with a gun.  *Id*. ¶¶11-12.  After running from the credit union, Mr. Reed carjacked a truck and struck a campus police vehicle.  *Id*. ¶15.  Following a jury trial in December 2005, Mr. Reed was convicted of armed bank robbery in violation of 18 U.S.C. § 2113(a) & (d) (Count 1); armed carjacking in violation of 22 D.C. Code § 2803(a)(1) & (b)(1) (Count 5); and destruction of property in violation of 22 D.C. Code § 303 (Count 7).  Superseding Indictment, ECF No. 15 (Jan. 13, 2004); Verdict Form, ECF No. 89 (Dec. 15, 2005).

Using the 2005 Sentencing Guidelines, Mr. Reed was considered a career offender because he had two prior attempted controlled substance offenses: a 1990 D.C. attempted distribution of cocaine offense and a 1990 D.C. attempted possession with intent to distribute cocaine offense.  PSR ¶¶34, 39-40.  This increased his Guidelines range for Count 1 to 262 to 327 months of imprisonment.  *Id.* ¶¶34, 44, 78.  Without the career offender designation, his Guidelines range would have been half as long: 135 to 168 months of imprisonment.  *Id*. ¶¶ 33, 43.

At Mr. Reed's sentencing in March 2006, the Court sentenced Mr. Reed at the top of the Guidelines range to 327 months of imprisonment for the armed bank robbery, 180 months of imprisonment for the carjacking, and 102 months of imprisonment for the destruction of property, to run concurrently to one another.  ECF No. 103 (Judgment) at 2 (Mar. 21, 2006).  He was also sentenced to a total of five years of supervised release.  *Id*. at 3.  Because the statutory maximum for Count 1 was 300 months, however, Mr. Reed was resentenced in April 2006 to a 300-month term of imprisonment for the armed bank robbery offense.  ECF No. 108 (Amended Judgment) at 2 (Apr. 12, 2006).  The concurrent sentences for the D.C. Code offenses and the supervised release terms remained the same.  *Id*. at 2-3.  The D.C. Circuit affirmed his conviction and sentence.  *United States v. Reed*, 522 F.3d 354, 356 (D.C. Cir. 2008).

## II.    Collateral Litigation

Mr. Reed has filed several collateral attacks on his conviction and sentence since July 2009, none of which have been successful.  *See* Order (Aug. 27, 2009), ECF No. 155 (denying *pro se* § 2255 based on ineffective assistance of counsel); Order (Jul. 14, 2015), ECF No. 178 (denying *pro se* challenge to career offender designation on basis of *United States v. Price*, 990

F.2d 1367 (D.C. Cir. 1993)); Minute Entry (Jun. 13, 2017) (granting motion to withdraw without prejudice § 2255 based on *Johnson v. United States*, 135 S. Ct. 2551 (2015)).

In August 2018 and November 2018, Mr. Reed, first *pro se* and then through counsel, filed a motion to vacate his sentence on the basis that he no longer qualified as a career offender under *United States v. Winstead*, 890 F.3d 1082 (D.C. Cir. 2018), which held that the definition of "controlled substance offense" in the Guidelines excludes attempt offenses.  ECF Nos. 189 & 197.   This motion remains pending.

### III.   Request for Reduction in Sentence/Compassionate Release.

On January 7, 2020, Mr. Reed, through counsel, filed a request for compassionate release/reduction in sentence with the Warden of USP Lompoc, explaining that extraordinary and compelling reasons existed because:

> Mr. Reed's 30-year-old son, Vincent Reed Jr., has had juvenile diabetes since he was 4 or 5 years old. Over time, Vincent Jr. has lost his sight and is now blind. He is now also experiencing kidney failure, which is a risk for those with Type I diabetes, and is on dialysis. Vincent Jr.'s doctors have determined that he is a candidate for a kidney transplant, and, as a genetic link between the donor and donee is beneficial, Mr. Reed is one of the best possible sources of that kidney. Vincent Jr.'s doctors will only be able to evaluate Mr. Reed's ability to donate his kidney if he is released. In addition, Vincent Jr. is being cared for by his 76-year-old [now 77-year-old] grandma, Mrs. Mary Ann Black, who is the only family member, besides Mr. Reed, able to care for an increasingly sick and dependent adult. At 76 years old, Mrs. Black is increasingly unable to shoulder the physical, financial, and emotional demands of caring for a blind and kidney-impaired grandson, and she needs Mr. Reed, as the only other family member interested and willing to take care of Vincent Jr., to be home to do so.

*See* Ex. C (Request to Warden).  On January 8, 2020, counsel received the following email from the institution: "Your request will be reviewed and a response will be forthcoming."  *Id.*  No response has since been received by either Mr. Reed or counsel.

Now 53 years old, Mr. Reed has been incarcerated for 16 years and 4 months (196 months).  *See* PSR at 2 (arrest date of December 2, 2003).  His projected release date is August 5, 2025.

## APPLICABLE LEGAL PRINCIPLES

In the First Step Act of 2018, Pub. L. 115-391 (Dec. 21, 2018), Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to allow a defendant to file a motion for a reduction of sentence based on extraordinary and compelling reasons.  Prior to this amendment, the BOP was the sole entity allowed to file such a request.  Now, a defendant may file such a motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  First Step Act § 603(b).

Section 3582(c)(1)(A) provides, in relevant part, that the Court "may reduce the term of imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that—"

(i)     extraordinary and compelling reasons warrant such a reduction; or

(ii)    the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

The Sentencing Commission's applicable guidance was issued before the passage of the First Step Act and has not been amended to account for the statutory changes to § 3582.

Accordingly, courts have held that "the most sensible interpretation of the Sentencing

Commission's guidance in light of Congress's recent statutory amendments is that 'the

Commission's existing policy statement provides helpful guidance on the factors that support

compassionate release, although it is not ultimately conclusive.'" *United States v. Bucci*, 409 F.

Supp. 3d 1, 2 (D. Mass. 2019) (quoting *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL

3046086, at *5 (D. Me. July 11, 2019)); *see also United States v. Beck*, No. 1:13-cr-186-6, 2019

WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful

guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and

compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

Tracking the language of the statute, the Guidelines suggest that a sentence reduction

may be warranted if "the court determines that—"

(1)   (A)  extraordinary and compelling reasons warrant the reduction; or

(B)  the defendant (i) is at least 70 years old; and (ii) has served at least 30
years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c)
for the offense or offenses for which the defendant is imprisoned;

(2)   the defendant is not a danger to the safety of any other person or to the
community, as provided in 18 U.S.C. § 3142(g); and

(3)   the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

According to the Guidelines application notes, "extraordinary and compelling reasons

exist" when, as relevant here, the defendant is "suffering from a serious physical or medical

condition . . .  that substantially diminishes the ability of the defendant to provide self-care

within the environment of a correctional facility and from which he or she is not expected to

recover."  U.S.S.G. § 1B1.13, appl. n. 1(A)(ii).  Extraordinary and compelling reasons also exist

for certain "family circumstances," either "(i) The death or incapacitation of the caregiver of the

defendant's minor child or minor children" or "(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." *Id.*, appl. n. 1(C). A sentence reduction may also be warranted for "[o]ther [r]easons," such as where "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with," his medical condition and/or family circumstances. *Id.* appl. n. 1(D).[13]

The Guidelines application notes also recognize that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction." *Id.* appl. n. 4. Thus, "[r]ead as a whole, the application notes suggest a flexible approach which considers all relevant circumstances." *Beck*, 2019 WL 2716505, at *8.

The BOP program statement on compassionate release is relevant only to the extent that its criteria are broader than those described in the Guidelines. *See* U.S.S.G. § 1B1.13, appl. n. 1(D) (instructing that the Director of the BOP may designate *additional* "extraordinary and compelling reason[s]"). It generally parallels the policies in the Guidelines. *See* PS 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g) ("BOP Program Statement"), at pp. 4-7 (Jan. 17, 2019); *but see The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, Office of Inspector General, U.S. Dep't of Just. ("*Aging Inmate Population*") at 45-46 (May 2015) (Rev. Feb. 2016),

---

[13]   To the extent that application note 1(D) restricts "other reasons" to those "as determined by Director of BOP," it conflicts with the First Step Act's statutory amendments and does not apply. *See United States v. Cantu*, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019). Instead, "[r]ead in light of the First Step Act, it is consistent with the old policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release." *Beck*, 2019 WL 2716505, at *9. Even before the First Step Act, the Commission recognized "that courts are in a 'unique' position to determine whether such circumstances are present." *Id.* at *9 & n.11; U.S.S.G. § 1B1.13 appl. n. 4.

https://oig.justice.gov/reports/2015/e1505.pdf (concluding that the BOP's criteria for elderly inmates are unclear, confusing, and overly-restrictive).

Notably, the First Step Act "was enacted to further increase the use of compassionate release and . . . explicitly allows courts to grant such motions even when BOP finds they are not appropriate." *Beck*, 2019 WL 2716505, at *6. Indeed, by permitting defendants to file sentence reduction motions directly with the sentencing court, regardless of whether the BOP has weighed in, the First Step Act reflects Congress's aim to diminish the BOP's control over compassionate release. *See United States v. Cantu*, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (explaining that "defendants no longer need the blessing of the BOP to bring such motions").

This Court may determine whether a defendant's conditions are extraordinary and compelling independent of those reasons provided by the Commission or the BOP. Courts have concluded that, after passage of the First Step Act, compassionate release is not limited by the Commission's or the BOP's understanding of "extraordinary and compelling reasons," and that courts can thus determine those reasons. *See United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019); *United States v. Bellamy*, 2019 WL 3340699, at *2 n. 5 (D. Minn. July 25, 2019) (citing lower court decisions); *Beck*, 2019 WL 2716505, at *5-6 (noting the First Step Act "was enacted to further increase the use of compassionate release and . . . explicitly allows courts to grant such motions even when BOP finds they are not appropriate"); *Cantu*, 2019 WL 2498923, at *3-5.

**ARGUMENT**

I.    **USP LOMPOC CANNOT PROTECT MR. REED FROM THE DEVASTATING EFFECTS OF COVID-19.**

Like cruise ships and nursing homes, prisons are "closed settings [that] have long been known to be associated with high transmission probabilities for infectious diseases."  *See* Ex. D (DC Medical and Public Health School Faculty COVID-19 Letter) at 3.  "The close quarters of jails and prisons, the inability to employ effective social distancing measures, the use of shared toilets, sinks, and showers, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely."  *See* Ex. D.  The virus is spread by asymptomatic and presymptomatic individuals.[14]  There is also not enough testing in BOP facilities, of symptomatic, asymptomatic and presymptomatic individuals alike.[15]  And there is insufficient personal protective equipment (PPE) in prisons,[16] with some staff either lacking the knowledge, or unwilling, to use the PPE that is available correctly: "All guards are now supposed to be

---

[14]    Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[15]    Eric Heisig, *Judge grills federal prisons lawyer on lack of coronavirus tests at Ohio facility in wake of Trump's claim that 'anybody' can get tested*, Cleveland.com (last updated Apr. 18, 2020). https://www.cleveland.com/court-justice/2020/04/judge-grills-federal-prisons-lawyer-on-lack-of-coronavirus-tests-at-ohio-facility-in-wake-of-trumps-claim-that-anybody-can-get-tested.html ("A federal judge weighing whether to order the release of hundreds of inmates from a federal prison in Ohio where the coronavirus has quickly spread seemed keenly interested as to why the prison had so few tests.").

[16]    *See, e.g,* Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. Is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020), https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits (hereinafter "Sick Staff"); Joseph Neff & Keri Blakinger, *Federal Prisons Agency "Put Staff in Harm's Way" of Coronavirus,* The Marshall Project (Apr. 3, 2020), https://www.themarshallproject.org/2020/04/03/federal-prisons-agency-put-staff-in-harm-s-way-of-coronavirus.

wearing masks and gloves but some just wear their masks around their chin," one inmate has explained. "I guess they are not concerned about our safety."[17]

Indeed, the social distancing measures in place in the rest of the United States—which are impossible in prison—are designed to "flatten the curve" of infections so that hospitals are not overwhelmed by a surge of cases. Until a vaccine is developed, they do not themselves *stop* the spread of the virus; the virus will spread, but more slowly.[18] What this means for USP Lompoc is that, because inmates are already sick, but living side-by-side in a closed building with recirculating air and highly-trafficked surfaces, the spread has proven impossible to contain.

At USP Lompoc, the first positive case announced by the BOP was on March 29, 2020. By March 30, 2020, three individuals had tested positive. By April 2, 2020, the number had increased to 13. Two days later (April 4, 2020), there were 19 positive cases, and two days after that (April 6, 2020), there were 28. By April 8, 2020, there were 39 positive cases. By April 10, 2020, there were 59 cases, and two days later (April 12, 2020), 63 cases. Two days after that (April 14, 2020), there were 86 positive cases; a day later, 91. On April 18, 2020, USP Lompoc announced its first inmate death from COVID-19. As of April 24, 2020, there are 97 positive cases at USP, one of which is Mr. Reed. Of these, 68 are inmates and 29 are staff. *See* Ex. E (BOP COVID-19 statistics – March 20, 2020 through April 24, 2020); Ex. F (Inmate Death at USP Lompoc – Press Release).

---

[17]    James Call, *Correctional officers file complaint about coronavirus at federal prison in Tallahassee*, Tallahassee Democrat (Apr. 17, 2020), https://www.tallahassee.com/story/news/politics/2020/04/18/correctional-officers-file-complaint-coronavirus-tallahassee-federal-prison/5152879002/ (hereinafter, "Correctional officers file complaint").

[18]    Thomas Peuyo, *Coronavirus: The Hammer and the Dance*, Medium (Mar. 19, 2020), https://medium.com/@tomaspueyo/coronavirus-the-hammer-and-the-dance-be9337092b56 .

These statistics, as bad as they are, may drastically underreport what is actually happening at USP Lompoc.  The BOP has undermined its credibility time and again by failing to provide accurate and transparent accounting of the number of infections in the BOP system.  For one, the BOP provides only a snapshot of a moment in time with its numbers, by removing from the positive cases at each institution those who it deems "recovered"; it is thus impossible to know the total number of positive cases that have been confirmed at USP Lompoc.  For another, the BOP finally confirmed last week what many advocates had long suspected: "that the bureau's case tracking does not include the privately run prisons," which have "a combined capacity for nearly 17,600 inmates."[19]  The Bureau "did not say why,"[20] and indeed there is no reasonable explanation except that the BOP wants to artificially keep the numbers low.  "'This is just another example of dereliction of duty as it relates to the safety of that population that's incarcerated by our government[.]'"[21]

Indeed, another USP Lompoc inmate appears to have contracted COVID-19 at that facility, was so sick it was hard to walk, but was put on a bus home anyways, only to die thereafter, and is thus not counted as a USP Lompoc death.[22]  Similarly, on April 17, 2020, a

---

[19]    Dan Kane, *A second federal prison in NC has coronavirus cases, and U.S. officials aren't tracking it*, News & Observer (Apr. 19, 2020), https://www.newsobserver.com/news/local/article242125516.html.

[20]    *Id.*

[21]    *Id.*

[22]    *See Lompoc prison inmate dies*, https://calcoasttimes.com/2020/04/17/lompoc-prison-inmate-dies-amid-worsening-coronavirus-outbreak/; *Coronavirus outbreak at Lompoc prison*, https://www.latimes.com/california/story/2020-04-16/coronavirus-outbreak-at-lompoc-federal-prison-is-worst-in-nation-with-69-inmates-25-staff-infected.

39-year-old staff member at USP Atlanta died suddenly in her home of COVID-19.[23]  The BOP apparently confirmed the same to news outlets, but as of Friday, April 24, 2020, the BOP had failed to include this staff member on its COVID-19 website.[24]  Importantly, the press reports that, according to a news release provided by the prison (but not anywhere accessible to others), the deceased staff member "had been successfully screened prior to entry [into the prison] and was asymptomatic" the Friday before she was found dead in her home.[25]  What is more, "four correctional officers at USP Atlanta [] complained of insufficient access to protective equipment and inconsistent communication about how many staff and inmates were infected at any given time."[26]

That the BOP wishes to keep the numbers low at the expense of accuracy, transparency, and staff and inmates' health is supported by the fact that, in at least one facility, BOP has declared all inmates presumptively infected, stopped testing altogether, and is refusing to release infection estimates.[27]  In another, the president of the correctional officers union estimates

---

[23]     Cassidy McDonald, *She was promoted a month before her death. Coworkers say she was never moved into her new role, away from sick inmates* CBS News (Apr. 20, 2020), https://www.cbsnews.com/news/coronavirus-death-robin-grubbs-atlanta-federal-penitentiary-workers-criticize-covid-19-response/ ("She was promoted a month before her death").

[24]     *See* BOP, *COVID-19 Cases*, https://www.bop.gov/coronavirus/  (last accessed 4/24/2020 7:55 p.m.).

[25]     WSBTV.com News Staff, *Atlanta Federal Penitentiary employee found dead tested positive for coronavirus,* WSBTV (Apr. 17, 2020), https://www.wsbtv.com/news/local/atlanta/atlanta-federal-penitentiary-employee-found-dead-tested-positive-coronavirus/UMVOBY6WZVCKHEOGLBHAIESLHU/.

[26]     *She was promoted a month before her death*, https://www.cbsnews.com/news/coronavirus-death-robin-grubbs-atlanta-federal-penitentiary-workers-criticize-covid-19-response/.

[27]     Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates for Coronavirus Due To 'Sustained Transmission,'* The Lens (Mar. 31, 2020),

inmate infection at 600% of BOP's public number.[28]  One BOP employee told news reporters that "the Bureau is playing with these numbers . . . , if they don't test 'em and they don't get confirmed they don't have to be reported."[29]  At one facility where six inmates have already died of COVID-19, which houses a total of 2,421 inmates, the government recently revealed that the facility only had 55 coronavirus tests, had only actually tested 37 inmates, and had only recently received 25 additional "rapid tests," though it now expected 25 more each week.[30] Indeed, at this facility, while the BOP lists on its website that there are 59 confirmed cases, "[o]fficials suspect another 207 have it."[31]

---

https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/  ("Louisiana Prison No Longer Testing") ("But the spokesperson said that the BOP would not be releasing the number of presumed positive cases, making it impossible to know how many prisoners at the facility have actually contracted the virus.").

[28]     Staff report, *Elkton union president reports different COVID-19 stats than Federal Bureau of Prisons*, WKBN News, Lisbon Ohio (Apr. 9, 2020), https://www.wkbn.com/news/coronavirus/elkton-union-president-reports-different-covid-19-stats-than-federal-bureau-of-prisons/  (stating that BOP was reporting just 10 inmate infections, but the union president had said management inside the prison gave "different numbers": 67 positive or symptomatic and isolated, 44 hospitalized, 14 on ventilators, 12 staff infected, three dead).

[29]     *Louisiana Federal Prison No Longer Testing*, https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/.

[30]     Eric Heisig, *Judge grills federal prisons lawyer on lack of coronavirus tests at Ohio facility in wake of Trump's claim that 'anybody' can get tested*, Cleveland.com (last updated Apr. 18, 2020). https://www.cleveland.com/court-justice/2020/04/judge-grills-federal-prisons-lawyer-on-lack-of-coronavirus-tests-at-ohio-facility-in-wake-of-trumps-claim-that-anybody-can-get-tested.html.

[31]     *Id.*

Even if the numbers were accurate, the BOP is failing in its duty to protect inmates and staff from this pandemic, which in turn has threatened surrounding communities.  "[M]ore than a dozen workers in the Bureau of Prisons" have reported that "federal prisons are ill-prepared for a coronavirus outbreak,"[32] while staff at one low-security facility described a potential outbreak as "mass chaos," and confirmed that BOP is "just not prepared to handle something of that nature."[33]

The outbreak at USP Lompoc is the only one at a congregate living facility in Santa Barbara County.[34]  And yet, as the number of infected at USP Lompoc has risen, it has so overwhelmed local hospitals that congressional leaders are requesting that the prison build its own mobile hospital on site:  "Otherwise, we threaten the lives of incarcerated individuals, the correctional staff, and risk overwhelming our existing healthcare resources.  The local hospitals cannot support an unlimited number of cases and continue to serve our communities effectively.  Already [as of April 15, 2020], 19 inmates have been hospitalized and six are on ventilators."[35]  At that time, Santa Barbara County had already seen 334 people test positive, with 38 hospitalized and two dead.[36]  And based on reports about protective equipment, these same

---

[32]     N.Y. Times, *Coronavirus in the U.S.: Latest Map and Case Count* (last updated April 17, 2020, 8:24 A.M. E.T.) https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

[33]     *See Sick Staff*, https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federalinmates-as-coronavirus-hits.

[34]     *Inmates and Families Panic*, https://www.independent.com/2020/04/22/inmates-and-families-panic-as-lompoc-prison-goes-into-lockdown/.

[35]     *Assistance for Lompoc*, https://carbajal.house.gov/news/documentsingle.aspx?DocumentID=649.

[36]     *Coronavirus outbreak at Lompoc prison*, https://www.latimes.com/california/story/2020-04-16/coronavirus-outbreak-at-lompoc-federal-prison-is-worst-in-nation-with-69-inmates-25-staff-infected.

congressional leaders expressed "concern[] [that] the staff members and law enforcement officers at the Lompoc USP are not being provided with the adequate PPE; thereby, creating unsafe working conditions and unnecessarily exposing incarcerated individuals and law enforcement personnel to COVID-19.  It is essential that the Administration immediately develop a plan to ensure the safety of these workers and everyone in the facility."[37]

      In addition to the added strain on community hospitals, when prisons start to see a rise in infections, the consequences for inmates, guards, and safety are far-reaching.  Most obviously, the greater number of sick staff, the fewer officers are left to guard a population scared and upset about the possibility of also contracting COVID-19.  "If officers start calling in sick in large numbers, problems could escalate quickly,"; "[t]here won't be anybody to guard the place[.]"[38] Guards are understandably afraid as well, of getting the virus themselves and passing it along to their families, but also of unrest: "At any time this could turn around against us and we could have a situation on our hands nationwide."[39]  Moreover, the greater number of hospitalized inmates, the greater number of prison guards guarding the inmates at the hospital, and the fewer staff left to guard the inmate population at the prison.[40]  "[Federal] officers have repeatedly voiced concerns about safety—both regarding disease control and the potential for violence."[41]

---

[37]    *Assistance for Lompoc*, https://carbajal.house.gov/news/documentsingle.aspx?DocumentID=649.

[38]    Keri Blakinger, *Coronavirus Restrictions Stoke Tensions in Lock-ups Across U.S.*, The Marshall Project (Apr. 2, 2020), https://www.themarshallproject.org/2020/04/02/coronavirus-restrictions-stoke-tensions-in-lock-ups-across-u-s ("Coronavirus Restrictions Stoke Tensions").

[39]    *Id.*

[40]    *Id.*

[41]    *Id.*

As one criminal justice consultant underscored: "Word of [positive COVID-19 cases] is going to spread like wildfire and that's when you're going to have the panic and the problems."[42]  He added: "This is truly unprecedented, having to lockdown a prison for an absolutely unknown amount of time due to a medical emergency."[43]  .

Quarantines and isolation are, after all, "a double edged sword":  "While the isolation might help slow the disease, it could increase tension and fear."[44]  "Without access to common areas and televisions, it can be hard for prisoners to find out what's going on in the outside world, creating more anxiety."[45]  In fact, families of those incarcerated at USP Lompoc have voiced increasing frustration with what "has been the acute lack of communication from both local federal prison leadership and the federal Bureau of Prisons (BOP) in Washington, D.C. Repeated calls to the Lompoc office and the BOP's administrative headquarters, they say, go either unanswered or are met with impatient responses that prisoner information cannot be released."[46]  What is more, "[i]t's not even clear [] who's in charge at Lompoc.  Until recently, it was an acting warden named James Engleman, but an officer who declined to give his name

---

[42]     *Id.*

[43]     *Id.*

[44]     *Id.*

[45]     *What Happens When More Than 300,000 Prisoners Are Locked Down?*, https://www.themarshallproject.org/2020/04/15/what-happens-when-more-than-300-000-prisoners-are-locked-down.

[46]     *Inmates and Families Panic*, https://www.independent.com/2020/04/22/inmates-and-families-panic-as-lompoc-prison-goes-into-lockdown/.

during a brief phone conversation with the *Independent* said the prison was now 'between wardens.'"[47]

USP Lompoc began a 14-day facility-wide lockdown on April 20, 2020, during which "inmates won't be allowed to use phones or email to communicate with the outside world."[48] "The announcement comes as Lompoc federal prison officials are facing increased public scrutiny over their handling of the outbreak, including their release of an inmate in the late stages of a COVID-19 infection who died four days after being sent home on a Greyhound bus."[49] Prison officials state that the lockdown is not punitive, but only to increase social distancing;[50] however, during this lockdown "staff [are] encouraged to use inmate discipline as a management tool."[51]  Notably, strategies to increase social distancing appear to themselves be punitive:

> All four areas [of the prison complex], with tightly packed bunk beds and only a handful of showers for every few hundred men, are ill-suited for social distancing. So to utilize as much space as possible, *prison authorities have reportedly reopened rooms that had been closed off because of black-mold contamination, including a kitchen*.[52]

Thus USP Lompoc is currently keeping all inmates from contact with the outside world, and housing some of them in contaminated quarters.

---

[47]      *Id.*  The *Independent* article was published on April 22, 2020; the USP Lompoc memoranda indicate that a B. von Blackensee was the Acting Complex Warden on April 17, 2020.  *See* Ex. B.

[48]      *Id.*

[49]      *Id.*

[50]      *Id.*

[51]      Ex. B (USP Lompoc Memoranda).

[52]      *Inmates and Families Panic*, https://www.independent.com/2020/04/22/inmates-and-families-panic-as-lompoc-prison-goes-into-lockdown/ (emphasis added).

The mayor of Lompoc has "held local and federal officials to task for the outbreak and its impact on her city. 'The federal officials have failed not only the inmates and staff but my community by not aggressively responding to the first reported case on March 30, when it was only 2 inmates and 1 staff member,' she said in an email on [April 19, 2020]."[53]  Mayor Osborne "disputed the BOP's claim that outbreaks such as Lompoc's couldn't be avoided, or as BOP Director Carvajal said on Tuesday: 'No amount of preparation could have left our institutions unaffected.'"[54]  "This outbreak is not a black swan event," she said. "It is an absolute known given [the prison] meets the tier one criteria as a congregate living facility.  Following appropriate pandemic protocols early and aggressively could have prevented this."[55]  Given what is known about USP Lompoc's response thus far to the pandemic, this Court should not trust that USP Lompoc can adequately monitor or protect Mr. Reed now that he has contracted COVID-19 under its care.

## II.    MR. REED'S MOTION FOR COMPASSIONATE RELEASE IS PROPERLY BEFORE THE COURT.

Mr. Reed filed a compassionate release request to the warden of USP Lompoc on January 7, 2020.  See Ex. C.  It has been more than 30 since this request, and therefore Mr. Reed's motion may now be considered by this Court.  *See* 18 U.S.C. § 3582(c)(1)(A).

---

[53]     *Id.*

[54]     *Id.*

[55]     *Id.*

### III.   THIS COURT SHOULD GRANT MR. REED COMPASSIONATE RELEASE BECAUSE THE BOP COULD NOT PROTECT HIM FROM CONTRACTING A LIFE-THREATENING ILLNESS AND HE IS NEEDED BY HIS DYING SON.

#### A.  Mr. Reed Is At Increased Risk of Death from COVID-19 and Should Be Released.

In opposition to several compassionate release motions, the government has claimed that a defendant's "condition or characteristic" and the COVID-19 pandemic may qualify as an "extraordinary and compelling reason" for compassionate release if, among other criteria, "the inmate is more likely to contract COVID-19 in his or her particular institution than if released."[56] Mr. Reed clearly meets this criteria, because he has already contracted COVID-19 in his institution.

The government has also claimed that, where an inmate is more likely to contract COVID-19 in his institution, extraordinary and compelling circumstances exist where a "defendant suffers from a medical condition or characteristic that elevates his risk of becoming seriously ill from COVID-19 under the CDC guidelines."[57]  Mr. Reed is male, above 50 years old, and African-American, each of which elevates his risk of becoming seriously ill from COVID-19.  That the government requires the characteristics to be under the CDC Guidelines is troubling given that the CDC has not been tracking fatalities by sex, and yet "the majority of victims are men," which may have "deep biological roots" centered on how women's bodies are better at fighting off infection.[58]

---

[56]    *See, e.g., United States v. Brasswell*, No. 11-cr-066 (RJL), ECF No. 28, Gov't Opp. at 11-12 (Apr. 20, 2020).

[57]    *Id.* at 11.

[58]    *See The coronavirus is killing more men*, https://www.washingtonpost.com/health/2020/04/04/coronavirus-men/; *see also* Ex. G

And while the CDC guidelines upon which the government has based its oppositions list only those "65 years or older," the CDC's most recent accounting of fatality rates indicated that 1,129 deaths out of 21,050 were of those 45 to 54 years old,[59] which is a mortality rate of 5.3 percent; in contrast, "The seasonal flu that we deal with every year has a mortality of 0.1%."[60]

Notably, unlike several states and counties, the CDC was not tracking COVID-19 by race until recently.[61]  But now that it is, the CDC's own statistics support what states and counties have found: that COVID-19 is "infecting and killing black Americans at a disproportionately high rate," so much so that this "emerging stark racial disparity led the surgeon general [] to acknowledge in personal terms the increased risk for African Americans[.]"[62]  Although more limited than the states, the CDC's own limited reporting shows that "even though African Americans accounted for 18 percent of the population, they made up 33 percent of people hospitalized."[63]

"One factor that might make the coronavirus more devastating for African-Americans is that they experience high levels of stress-mediated wear and tear known as 'weathering,' said

---

(Declaration of Dr. Chris Beyrer, Professor of Epidemiology, Int'l Health, & Medicine, Johns Hopkins School of Public Health), at ¶6

[59]      *See Provisional Death Counts*, https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm.

[60]      Claire Gillespie, *This Is How Many People Die From the Flu Each Year, According to the CDC*, Health (Mar. 26, 2020), https://www.health.com/condition/cold-flu-sinus/how-many-people-die-of-the-flu-every-year.

[61]      *The coronavirus is infecting and killing black Americans at an alarmingly high rate*, https://www.washingtonpost.com/nation/2020/04/07/coronavirus-is-infecting-killing-black-americans-an-alarmingly-high-rate-post-analysis-shows/?arc404=true .

[62]      *Id.*

[63]      *Id.*

Arline Geronimus, a professor of public health at the University of Michigan who studies the concept."[64]  Dr. Geronimus explained that "stresses like exposure to toxins, lack of sleep and racial discrimination . . . can cause a kind of accelerated aging."[65]  This is especially troubling because the Department of Justice Inspector General has already reported that "an inmate's physiological age averages 10–15 years older than his or her chronological age due to the combination of stresses associated with incarceration and the conditions that he or she may have been exposed to prior to incarceration."[66]  And should Mr. Reed's physiological age be closer to 63 or 68 years old (*i.e.*, 10-15 years older that his chronological age), the CDC reports that the death rate increases to 12% for those 55-64 years old, and to 21.7% for those 65-74 years old.[67]

　　　　With no means to contact Mr. Reed, counsel is left in the dark about his actual condition. But if he is not hospitalized and under the care of a strapped community hospital, here is some of what Mr. Reed may be experiencing alone and without adequate supervision by an increasingly thinning staff:  "The new coronavirus kills by inflaming and clogging the tiny air sacs in the lungs, choking off the body's oxygen supply until it shuts down the organs essential for life."[68]

---

[64]　　John Eligon et al., *Black Americans Face Alarming Rates of Coronavirus Infection in Some States* N.Y. Times (Apr. 7, 2020, updated Apr. 14, 2020), https://www.nytimes.com/2020/04/07/us/coronavirus-race.html.

[65]　　*Id.*

[66]　　Office of the Inspector General U.S. Department of Justice, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015, rev. Feb. 2016) at 2, https://oig.justice.gov/reports/2015/e1505.pdf.

[67]　　*See Provisional Death Counts*, https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm.

[68]　　Lenny Bernstein et al., *Coronavirus destroys lungs. But doctors are finding its damage in kidneys, hearts and elsewhere*, Washington Post (Apr. 15, 2020), https://www.washingtonpost.com/health/coronavirus-destroys-lungs-but-doctors-are-finding-its-damage-in-kidneys-hearts-and-elsewhere/2020/04/14/7ff71ee0-7db1-11ea-a3ee-13e1ae0a3571_story.html.

"[C]linicians around the world are seeing evidence that suggests the virus also may be causing heart inflammation, acute kidney disease, neurological malfunction, blood clots, intestinal damage and liver problems."[69]  And "[p]neumonia caused by the coronavirus has had a stunning impact on the [] hospital system" in one of the most hard-hit areas of the United States, and "[b]y the time patients have noticeable trouble breathing and present to the hospital with dangerously low oxygen levels, many will ultimately require a ventilator."[70]

As we learn more about COVID-19, it is becoming apparent that signs of worsening illness are often subtle (particularly low blood-oxygen level), and could be easily (and understandably) overlooked by an overworked BOP employee monitoring dozens of sick inmates.[71]  Also, there is a common pattern of people seeming to get better right before they get worse.[72] And it is harrowing for someone housed in a single room or unit filled with COVID patients to know that more intense exposure to the virus can lead to more dangerous infections.[73] Further, even if Mr. Reed is able to make a full recovery by the time this Court makes a decision,

---

[69]     *Id.*

[70]     Richard Levitan, *The Infection That's Silently Killing Coronavirus Patients*, N.Y. Times (Apr. 20, 2020), https://www.nytimes.com/2020/04/20/opinion/coronavirus-testing-pneumonia.html.

[71]     *The Infection That's Silently Killing Coronavirus Patients*, https://www.nytimes.com/2020/04/20/opinion/coronavirus-testing-pneumonia.html.

[72]     Shera Feder, *Coronavirus symptoms might get better before they get worse, and the downturn can happen very quickly, doctors say*, Business Insider, https://www.businessinsider.com/coronavirus-symptoms-start-slow-and-worsen-quickly-doctors-say-2020-3.

[73]      Joshua D. Rabinowitz and Caroline R. Bartman, *These Coronavirus Exposures Might Be the Most Dangerous*, N.Y. Times, https://www.nytimes.com/2020/04/01/opinion/coronavirus-viral-dose.html.

he is living an absolute nightmare right now,[74] and compassionate release would be appropriate. He should not have to reenter the prison's general population to serve the last five years of a 300-month sentence that today would be at most 168 months, while living with the trauma of what he is going through now and in terror of getting sick again.[75]

Releasing Mr. Reed from USP Lompoc will not only protect him from the risk of death and severe complications, but will protect the prison and the community.  Experts agree that the "release of detainees who present a low risk of harm to the community is [] an important mitigation strategy" for USP Lompoc and the community as a whole, because, by shrinking the inmate population, "it allows for greater social distancing, which reduces the chance of spread [now that the] virus [has been] introduced; it allows easier provision of preventive measures such as soap for handwashing, cleaning supplies for surfaces, frequent laundering and showers, etc.; and it helps prevent overloading the work of detention staff such that they can continue to ensure the safety of detainees."  *See* Ex. H (Declaration of Dr. Marc Stern) at ¶9.  In fact, the fewer inmates at USP Lompoc, the fewer who have to be housed in rooms that were formerly closed due to mold contamination.  Releasing Mr. Reed will also protect the two hospitals currently seeing a surge of COVID-19 patients from USP Lompoc from becoming overwhelmed.[76]  Mr.

---

[74]    *Inmates and Families Panic*, https://www.independent.com/2020/04/22/inmates-and-families-panic-as-lompoc-prison-goes-into-lockdown/.

[75]    Contrary to popular belief (and hope), there is no evidence that COVID-19 infection gives a person long-term immunity from further infection.  Amelie Bottollier-Depois, *Scientists Still Don't Know if Recovering From COVID-19 Confers Immunity or Not*, Science Alert, https://www.sciencealert.com/scientists-still-don-t-know-if-recovering-from-covid-19-confers-immunity-or-not.

[76]    *See* Ex. H at ¶10; *Assistance for Lompoc*, https://carbajal.house.gov/news/documentsingle.aspx?DocumentID=649.

Reed needs to be removed from the confines of USP Lompoc so that Lompoc as a community is protected and those who love him can monitor him as he heals.

When this Court sentenced Mr. Reed, it did not "intend for that sentence to 'include a great and unforeseen risk of severe illness or death' brought on by a global pandemic." *United States v. Zukerman*, No. 1:16-cr-194-AT, Dkt. No. 116 (Apr. 3, 2020) ("The severity of Zukerman's conduct remains unchanged. What has changed, however, is the environment where Zukerman is serving his sentence."). "These are not normal times[.]" *United States v. Gonzales*, 2020 WL 1536155, at *3 (E.D. Wash. Mar. 31, 2020) (granting compassionate release to 60-year old defendant with underlying health condition). The high mortality rate for those of Mr. Reed's age, race, and gender, coupled with the inability of USP Lompoc to address its current surge in cases, make clear that these are just the kind of extraordinary and compelling circumstances that warrant a sentence reduction in this case. Accordingly, the Court should exercise its discretion to order Mr. Reed's immediate release from prison.

### B.  The Guidelines Also Support Granting Mr. Reed Compassionate Release.

Mr. Reed also qualifies for compassionate release because his circumstances are covered by the guidance in the Sentencing Guidelines. "Read as a whole, the application notes [to the Sentencing Guidelines] suggest a flexible approach which considers all relevant circumstances";[77] the guidelines "provide helpful guidance, but are not ultimately conclusive."[78] Under the Guidelines' criteria, extraordinary and compelling reasons exist for those "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the

---

[77]  *United States v. Beck*, No. 1:13-cr-186-6, 2019 WL 2716505, at *8 (M.D.N.C. June 28, 2019).

[78]  *United States v. Bucci*, 409 F. Supp. 3d 1, 2 (D. Mass. 2019) (emphasis added) (quoting *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, at *5 (D. Me. July 11, 2019)).

defendant to provide self-care within the environment of a correctional facility"; this describes Mr. Reed, who is now suffering from a life-threatening illness that the Attorney General himself has found is an "emergency condition [] materially affecting the functioning of the Bureau of Prisons."[79]  And if he cannot get the appropriate care, he very well may not recover.  U.S.S.G. § 1B1.13, appl. n. 1(A)(ii).

Finally, the Guidelines recognize compassionate release in certain "family circumstances," including when the caregiver of an individual's child becomes incapacitated. Though no longer minor, Vincent Jr. is dying.  His caregiver is becoming incapacitated by age and the increasing demands on her, at 77 years old, to take care of a full-grown man who is totally blind and fully dependent on her for his care and transportation, including to dialysis treatment 3 times per week for his failing kidney.  By granting Mr. Reed compassionate release, this Court would give Mr. Reed the opportunity to return to his son in time and possibly provide him with the kidney he so desperately needs.

Granting Mr. Reed compassionate release, recognizing the needs of his dying son and his son's aging caregiver, as well as Mr. Reed's own risks from COVID-19, is well within the spirit of the Guidelines and the First Step Act's intention to "further increase the use of compassionate release."  *Beck*, 2019 WL 2716505, at *6.  "Releasing a prisoner who is for all practical purposes deserving of compassionate release during normal times is all but mandated in the age of COVID-19."  *United States v. Resnik*, 2020 WL 1651508 (S.D.N.Y. Apr. 2, 2020); *see also United States v. Hammond*, No. 02-cr-294 (BAH), ECF No. 51 (Mem. Op. & Indicative Ruling) (Apr. 16, 2020) (granting compassionate release to inmate with 7 more years to serve whose age

---

[79]     Attorney General Barr, *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020), https://www.justice.gov/file/1266661/download.

and health conditions, along with COVID-19, were "extraordinary and compelling" reasons for

his release, and his release was "consistent with applicable policy statements issued by the

Sentencing Commission").

## IV.   MR. REED IS NOT A DANGER TO THE COMMUNITY AND HIS CONTINUED INCARCERATION IS GREATER THAN NECESSARY TO ACCOMPLISH THE GOALS OF SENTENCING.

The § 3553(a) factors also support compassionate release.  Mr. Reed has already been

significantly punished and is not a danger to the community.  Because of contracting COVID-19,

Mr. Reed has likely spent recent days in severe discomfort and in fear for his life.  "This means

that his sentence has been significantly more laborious than that served by most inmates.  It also

means that further incarceration in his condition would be greater than necessary to serve the

purposes of punishment set forth in § 3553(a)(2)."  *United States v. Andre Williams*, No.

3:04cr95/MCR, Order at 11, ECF No. 91 (N.D. Fla. Apr. 1, 2020) (quoting *United States v.

McGraw*, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019)).[80]

Mr. Reed now reads, writes and successfully uses a computer, although spelling can still

be difficult for him.  He has taken many of those classes afforded to him in prison, including on

subjects as diverse as Stress and Anger Management, the History of Christianity, Sustainable

Living, and Exploring Latin American Geography.  He participated fully in the psychology

program to which he was assigned, and has also taken the 500-hour drug program that this Court

ordered at sentencing.  *See* Judgment, ECF No. 103 at 2.  During his imprisonment, Mr. Reed

has worked in UNICOR, in the prison landscaping program, in food service, and as a recreational

referee, a recreational aide, and a corridor orderly.  UNICOR jobs are highly sought after, with

---

[80]     Andre Williams was granted compassionate release, but too late: he died on the morning his son was driving to pick him up from his prison.

"approximately 25,000 inmates [] waiting to work in UNICOR," but "only 8% of work-eligible

inmates participat[ing] in the program." *See* UNICOR Program Details, available at

https://www.bop.gov/inmates/custody_and_care/unicor_about.jsp (last accessed Jul. 5, 2019).

Yet participation results in great benefits:

> The Post-Release Employment Project (PREP) compared inmates who worked in
> prison industries with similar inmates who did not participate in the FPI program.
> PREP found that inmates who worked in FPI were significantly less likely to
> recidivate than inmates who did not participate. Inmates who participated were 24%
> less likely to revert to criminal behavior as much as 12 years following release and
> 14% more likely to be gainfully employed following release from prison. Minority
> groups benefited the most when compared to their non-minority counterparts.
> Inmates who participated in FPI were also less likely to engage in prison misconduct
> while still incarcerated.

*Id.* To counsel's knowledge, Mr. Reed's last disciplinary issues were over 8 years ago, and

while he is in a medium security facility, his security level is minimum; he requested transfer to,

and remains, at USP Lompoc to be closer to his son.

 "Any limited risk can be mitigated by supervision." *Bellamy*, 2019 WL 3340699, at *6.

Indeed, Mr. Reed will be on strict conditions of supervision upon his release for a 5-year period

of time. *See* ECF No. 103 (Judgment). A time-served sentence equals the 196 months Mr. Reed

has so far served, which does not even account for his good time credits, and is significantly

above the non-career offender Guideline range of 135 to 168 months that this Court would have

considered if Mr. Reed were sentenced after *Winstead*. A reduction in Mr. Reed's sentence to

time-served is sufficient to serve the purposes of punishment under § 3553(a)(2); and, given his

COVID-19 diagnosis and his son's precarious health, "a longer sentence would be greater than

necessary to serve those purposes." *Beck*, 2019 WL 2716505, at *12.[81]

---

[81]    This Court may order Mr. Reed's release even though two of his offenses are D.C. Code
offenses for the reasons provided in *United States v. Hammond*, No. 02-cr-294 (BAH), ECF No.
51 at 12-16 (Mem. Op. & Indicative Ruling) (Apr. 16, 2020).

V.      MR. REED'S RELEASE PLAN.

According to the CDC, while generally facilities should "[r]estrict cases from leaving the facility while under medical isolation precautions," this does not apply when an inmate is "released from custody," and in this situation, the prison authorities are to "contact public health to arrange for safe transport and continuation of necessary medical care and medical isolation as part of release planning."[82]  Mr. Reed asks that this Court order his release pursuant to this CDC guidance.

Should this prove unworkable, the CDC indicates that release from medical isolation is also appropriate for positive COVID-19 cases where: "The individual has been free from fever for at least 72 hours without the use of fever-reducing medications," and "The individual's other symptoms have improved (e.g., cough, shortness of breath)" and "At least 7 days have passed since the first symptoms appeared."[83]  For those who never showed symptoms, release is appropriate where: "At least 7 days have passed since the date of the individual's first positive COVID-19 test" and "The individual has had no subsequent illness."[84]  If safe transport while in isolation cannot occur, Mr. Reed asks this Court to order that he be released pursuant to this criteria.  As it has done in other cases, the BOP will then arrange for his travel.

Upon release, Mr. Reed will reside with his brother Kevin Reed, at his home in Southeast, Washington, D.C.  Kevin Reed is 51 years old, employed, and has no health conditions, and he will be able to take Mr. Reed to any medical appointments necessary in a

---

[82]      *Interim Guidance* at 14, https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

[83]      *Id.*

[84]      *Id.*

family member's car.  Mr. Reed will have his own room and, in contrast to his treatment at USP

Lompoc, will be monitored by a single caring family member concerned for his welfare.

Because of his intention to isolate himself, Mr. Reed requests that this Court amend his

conditions of supervised release so that he need not report in person to the Probation Department,

and to instead allow him to contact the Probation Department by telephone within 72 hours of his

release.

**CONCLUSION**

"People do not stop being human the day they are sentenced.  Although some have made

terrible choices or engaged in reprehensible behavior, the sentence they received for their crime

did not include contracting COVID-19 and death."[85]  For the foregoing reasons, Mr. Reed

respectfully requests that this Court grant his motion, reduce his sentence to time-served, and

order the BOP to contact public health to arrange for safe transport and continuation of necessary

medical care and medical isolation as part of release planning.

A proposed order is attached.  Mr. Reed respectfully requests that this Court issue an

amended judgment as well, as the BOP has indicated in some (though not all) cases that it

requires such an amended judgment prior to processing compassionate release orders.

---

[85]     DA Rachael Rollins, *Statement of Suffolk County District Attorney Rachael Rollins on
today's hearing before the Supreme Judicial Court* (Mar. 31, 2020),
https://www.suffolkdistrictattorney.com/press-releases/items/2020/3/31/statement-of-suffolk-county-district-attorney-rachael-rollins-on-todays-hearing-before-the-supreme-judicial-court.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
JOANNA MUNSON PERALES
Research & Writing Attorney
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500